**RECEIVED**

**MAY 2 6 2022**

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| **ALBERT R STEWARD, III** | **Case No:** 22-cv-1428 JRT/JFD |
| Plaintiff, | |
| vs. | **MURDER FOR HIRE** |
| | **CONSPIRACY TO COMMIT MURDER** |
| **FEDERAL REPUBLIC OF NIGERIA,** | **ATTEMPTED MURDER** |
| **NIGERIAN DRUG LAW ENFORCEMENT AGENCY,** | **CRULE AND INHUMAN TREATMENT** |
| **THE CENTRAL BANK OF NIGERIA,** | **TORTURE** |
| **JOHN DOES 1-20,** | **FALSE IMPRISONMENT** |
| Defendant(s) | **INTENTIONAL INFLICTION OF** |
| | **EMOTIONAL DISTRESS** |
| | **DEFAMATION AND FRAUD** |
| | |
| | **JURY TRIAL DEMANDED** |

Plaintiff Albert R. Steward, III, (Steward), for his Complaint against Defendants,

Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA),

Central Bank of Nigeria and John Does 1-20, the evidence will show at trial, that each

allegation stated by Plaintiff is true and that each is responsible and are accountable for

any and all damages assessed against the Plaintiff, in addition the evidence will show

that the Nigerian Governments agents were/are paying inmates at Kuje Prison, known

as John Does 1-20, (Collectively "Defendants"). To cause harm to Plaintiff, Plaintiff

states and alleges as follows:

### INTRODUCTON

1. The Plaintiff Albert R. Steward, III brings this lawsuit for Murder for Hire,

Conspiracy to Commit Murder, Attempted Murder, Cruel and Inhuman

Steward v Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency,
Central Bank of Nigeria, and John Does 1-20.

Page 1 of 27

**SCANNED**

MAY 2 6 2022

U.S. DISTRICT COURT ST. PAUL

Treatment, Torture, False Imprisonment, Intentional Infliction of Emotional Distress, Defamation and Fraud, and a n y a n d a l l other torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., arising from a planned attack on the Plaintiff by, The Federal Republic of Nigeria, The Nigerian Drug Law Enforcement Agency, The Central Bank of Nigeria and, and inmates in the Abuja Prison, that were paid by the Nigerian Governments agents, along with The Central Bank of Nigeria who colluded with NDLEA agents to submit false bank documents designed to look as if the Plaintiff had accounts with the bank, along with members of a drug cartel wherein the received telephone conversations from the Defendant's telephone records will clearly show evidence that they are all working hand in hand with each other.

The Defendants own telephone records received from Plaintiff's CLOSS FILE records, will show that when the Plaintiff on September 14, 2018 was arrested at the Abuja International airport in Nigeria that it was planned well in advance of his arrival.

## THE PARTIES

2.      Plaintiff, Albert R. Steward, III, a senior citizen and natural person of the United States of America and a resident of the State of Minnesota.

3.      Defendant, The Federal Republic of Nigeria is a federal republic modelled after the United States, with executive power exercised by the President. In 2021, the country ranked 154th in the 180 countries listed in Transparency International's Corruption Index (with South Sudan, at 180th, being the most corrupt, and Denmark the least). Corruption runs through every level of Nigerian government. From considerable

contract fraud at the top, through petty bribery, money laundering schemes, embezzlement and seizing salaries from fake workers, it is estimated that corruption within the state apparatus costs the country billions of dollars every year.

4.      Defendant, The Nigerian Drug Law Enforcement Agency. (NDLEA) is a Federal agency in Nigeria charged with eliminating the growing, processing, manufacturing, selling, exporting, and trafficking of hard drugs. The agency was established by Decree Number 48 of 1989. NDLEA is present in international airports, seaports and border crossing. Its purpose is to try to eradicate cannabis by destroying plantings. NDLEA is also supposed to target the leaders of narcotics and money laundering organizations.

5.      Defendant, The Central Bank of Nigeria, is the Central bank and apex monetary authority of Nigeria established by the CBN Act of 1958 and commenced operations on July 1, 1959.

6.      Defendant, John Does 1-20, Nigerian Government paid inmates of the Abuja prison. Based on information and belief are associated with the agents of The Federal Government of Nigeria and agents of The Nigerian Drug Law Enforcement Agency the Central Bank of Nigeria.

## JURISDICTION AND VENUE

7.      This Court has personal and subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), and 1605A.

8.      Venue is proper in this District under 28 U.S.C. § 1391(f)(1).

9.      28 U.S.C. § 1605a (1) provides **(1)NO IMMUNITY.—** A foreign state shall not be immune from the jurisdiction of courts of the <u>United States</u> or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of <u>torture, extrajudicial killing, aircraft sabotage, hostage taking,</u> or the provision of <u>material support or resources</u> for such an act if such act or provision of <u>material support or resources</u> is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

## FACTUAL BACKGROUND

10.     Plaintiff Steward a United States citizen who, On September 8, 2018 he left on what was supposed to be a 10 to 15-day trip, going from Minnesota to London to New Zealand for the main purpose of selling his internet programs and businesses to a group in New Zealand, and then back home. The day before leaving the plan changed, he was to go to Nigeria to sign some documents, then to New Zealand, Plaintiff decided to take advantage of it and ultimately visit Dubai then to New Zealand.

11.     On or about February 3, 2017 Steward begin receiving emails from a person calling himself David Jackson. Mr. Jackson was saying that steward was entitled to a $10.5 million dollar inheritance, but he needed to go through Nigeria to

sign documents and then take the documents to New Zealand. Mr. Jackson was very convincing for he mentioned properties that steward had lived in the past and linking the person who had supposedly left the money.

12.     Another convincing factor was that all expenses were to paid for, the plane tickets, the hotel, food and everything was to be paid for, Steward supposedly had to pay nothing out of pocket. Although when arriving at the airport in Abuja, Steward had to pay $260.00 of his own money for a VISA on arrival fee.

13.     Unknown to Mr. Jackson and his cartel, Steward had been talking with a group from London about selling his internet advertising businesses (GlobalBanners.com), which had taken over 20 years to perfect, with an proposed estimated valued of well over $600 million (Exhibit "C Page 1"), thus Steward decided to take advantage of having the trip paid for, so instead of meeting the group in London they were to meet in New Zealand, however due to the direct illegal and preplanned actions of the Defendants, Plaintiff lost all his software and businesses valued as stated in Exhibits "C" of $615,648,972.00, therefore Defendants are liable to Plaintiff in the amount of $615,648,972.00 plus interest plus punitive damages and any additional amounts the Court may deem appropriative.

14.     Steward, by instruction of Mr. Jackson, left on the first phase of his trip on September 8th 2018. Arrived in London on the 9th and landed in Nigeria at approximately 5:00am on September 10th 2018. As informed by Mr. Jackson, a driver was waiting and after going through the VISA on arrival process the driver took Steward to a hotel called The Tranquil Mews Hotel, located at Plot 1079, Umar Shuaibu Avenue, off Good Tidings

Church, Off Ngozi Okonjo Lweala Road, Utako, Abuja, Nigeria.

15.     On the 10th Steward received a call from Mr. Jackson informing him his colleague, whom he said his name was Jerry would be stopping by to make sure all was ok and said for Plaintiff to order anything he needed from room service. On the 11th a young man calling himself Jerry stopped by and introduced himself and said he needed to get gifts for the Executives in New Zealand and that he would stop back the next day.

16.     On the 12th, he stopped by and said he was still getting the gifts together and he also gave me a small cell phone, he said it would make contact easier.

17.     On the 13th he called on the phone he had given Plaintiff and said again he was getting the Documents that were needed to sign and the gifts for the Executives and he would be there tomorrow to take Plaintiff to the airport.

18.     On the 14th, he called and said he was on his way, we were to be at the airport by 3:00 pm, he arrived at approximately 2:25pm, and it would take time to get to the airport, he came into the room and showed me a travel bag, which had shirts and bags of coffee beans, or so I thought, along with the documents to be signed, we were running late thus there was no time to look closely at the documents, which appeared to be part of their plan, Jerry held up only the corners of the 3 pages  which was all of the documents that could be seen, so they were signed because of the rush for time and the need to get to the airport.

19.     The travel bag containing the items; Jerry took a picture of me with his travel bag and my garment bag and stated not to worry about the luggage it would be

taken at the airport.

20.     After collecting everything we left for the airport, there was a driver waiting in the parking lot, I continued to the vehicle, while Jerry stopped at the register desk and paid in person whatever was owed at the Hotel.

21.     When reaching the vehicle, the trunk was open and I placed my bag into the trunk, and got in the front seat. When Jerry came out, he kept his bag with him in the back seat and we left for the airport. On the way Jerry gave me $200 of the $260 that I had paid at the airport for the VISA on arrival fee.

22.     When arriving at the airport, we parked in the parking lot for approximately a half hour, then suddenly Jerry said "they are here", then the driver pulled up to a different spot and Jerry said for me to wait and he got out to flag down a porter, who then took my travel bag out of the trunk, Jerry's gave him his bag by placing it on the porter's cart and I was told to just follow the porter, who took me to the Emirates check-in counter. From there the Porter unloaded the bags and someone else took them to what Plaintiff though was a weighing station, then the person brough them back and someone else took them and said for Plaintiff to follow, and he was taken through the immigration area and luggage check in. The person filled out the form, the luggage was taken to be loaded onto the plane, or so I thought.

23.     As I'm going to the loading platform I was instructed to step aside and two others came and said for me to follow them, they took me back to the luggage area and brough out my travel bag, and the other bag that Jerry had brought. They asked me if it

was mine and I said no it was Jerry's, then they asked me to open it, so I started to and someone else came and said not to open it here, they took me to the NDLEA office at the airport where it was opened.

24.     It was not coffee! It turned out to be in total 5.3kg of Methamphetamines. On November 14, 2018, I was arrested at the airport and charged on November 18, 2018 (Exhibit "A"). While I was in NDLEA offices, I was constantly being told not to worry for they kept saying, "We know exactly what was going on". In the next 5 hours I was writing my statement with the aid of the agents at the airport, I would start one and then it was not acceptable, I would be told to start another one for a total of 7 times that I would stop and then rewrite my statement.

25.     Then at approximately 11:00 pm, other agents brough in Jerry, in handcuffs and sat him in a chair across the room right in front of me, I was flabbergasted, on how they could have caught him so quickly, I did not give any description of him, nor was I asked, yet they brought him in.

26.     After several days in the holding cell in the airport, I discovered why he was apprehended so quickly, he had done the same thing to an older woman from London, for her protection we will just call her Ms. Emi, where in her case they disguised their drugs as a box of chocolates. He was being watched, his group of people used the same name David Jackson and the same ruse, to where they paid for everything.

27.     The NDLEA area in the airport had two cells, at first Ms. Emi was in one and they placed Jerry in the other, I was put on the floor in the interrogation room where

I was writing my statements, after 2 days, for reasons that came clear sometime after, I was put in the same cell as Jerry.

28.    It should also be noted that Ms. Emi was allowed to use a laptop computer to pay her bills and anything else that she needed to do – however the agents were given strict instructions that I was not allowed to have access to electronic medium, I asked several times if I could setup auto pay so I would be able to keep everything going, my request was a quick reply of no.

29.    I was also informed of his real name, it was not Jerry it is Anthony Chinedu Okeke, male, 36 years old of No. 1 Asiata Street Okota, Lagos, and during his interrogation he admitted that Steward had no Idea as to what was going on which completely exonerated the Plaintiff, yet Steward was not released as the law provides (Exhibit "D"), in fact this whole scenario is just one of the typical scams run by some government officials. They target an individual whom they think they will be able to get money from. They first stop the person, just before they board an airplane, or boat or any other means of transportation that they oversee, then they get the persons personal contacts, usually from the persons cell phone, then they start calling the contacts attempting to extort money from them by saying the person is in trouble and try to get the person(s) to send them money.

30.    During the interrogation's I was asked if they could look into my cell phones to see if they could find anything about Mr. Jackson or anything else, since I knew I had done nothing wrong, and I was present at the time they made the request, I

had no objections. I had three new phones, an iPhone X, iPhone 6c, and a Kyocera cell phone, the type of cell phone Okeke gave him is unknown, but NDLEA has all 4 of them, even after the American Embassy requested their return, to this day, they were never returned to Plaintiff.

31.     For protection on each of Plaintiff's phones there is a legal disclaimer which rules over a program that is called a (**CLOSS FILE)** (Exhibit "B") – this program, of which Plaintiff created does several things; a) It adds Back-Tracking Technology (BTT), attaching itself to any and all information to any device should any unauthorized removal or cloning take place, b) should anyone take anything from Plaintiffs equipment without his permission, the parties or organizations, or government agencies' pursuant to the Disclaimer Agreement, wave any and all immunities, including but not limited to witness immunity, public officials' immunity from liability, sovereign immunity, and diplomatic immunity or personal protections that they may normally have, c) should Plaintiff fail to check into his account after a predetermined time, the information gathered would be sent to a law firm, then that law firm would forward all the collected information to Frank Vascellaro and Amelia Santaniello of WCCO TV.

32.     **What this CLOSS FILE does and why it is so important:** If without permission, any information that is taken from the phone(s), it will place an active file on whatever electronic medium the stolen information is put on, and then; 1) Takes a picture of the operator (if a camera is on the device), 2) It transmits all of the pictures, emails, SMS messages and text messages from the device it is transferred to, to a cloud server, 3)

It forwards that same CLOSS FILE to any device that the stolen information is distributed to, and continues the extraction process until a kill code is entered into the device or the device is destroyed.

33.    The discoveries received from the CLOSS FILE were received from thirty-four (34) cell phones and four (4) computers that Plaintiff's telephone information was distributed to. Wherein the collected evidence shows not only was Plaintiff set-up, but he was setup by the Nigerian Governments Agents, including but not limited to The Agents of the Nigerian Drug Law Enforcement Agency along with the Central Bank of Nigeria and John Does 1-20, wherein the collected phone records includes the photos and conversations held by the officials who admitted not only to setting up the Plaintiff, but a multitude of other happenings, including bribery, murder, collusion with known drug kingpins and high level government officials about how they select a person to question and take the person's cell phone and call their family members to try and extort money from them, and much more. In Plaintiffs case they did just that, they called the numbers and tried to get family and friends to send them money. All records collected will be made available, according to law, prior to trial.

34.    It was strange or lucky depending on how you look at it, the holding cell that I was in, is located directly under the offices on the second floor, and through the air vents I could hear the conversations that went on in the room above. Several conversations were the officers trying to get money from other people. They would take the phone from whomever they had in custody and call the contacts in the phone to try and extort money

from them, my friends were in that group. In fact, I could hear them talking to a former girlfriend of mine, trying to get her to send money, asking her if she had access to any of my bank accounts, etc., this went on for several weeks, and I knew I had to do something. My cell mate was still conducting his activities even though he was behind bars and with his connections he was able to receive a cell phone. Because of all the conversations I could over hear from the room above, I made the choice to use his phone to call those needed to be sure they would not send any money, or even worse come to Nigeria, so I first called my former girlfriend and told her "Do not believe anything coming out of Nigeria", that was all I said, I also called the landlord, thinking I was going to be deported soon, and basically told them the same thing and that I expected to be back shortly.

35.     A few days later when Mr. Paul finally realized they would not get any money from anyone, he came down into the holding cell offices and said quite loudly "there is no money"! At that point I knew other members in the NDLEA office were also involved in the scams. Who exactly, I do not know, I did not have direct view of the office I could not see who was out there but I could hear everything that was going on.

36.     Through the evidence of the telephone photos and conversations, etc., it was discovered that the Defendants were all colluding together and have been for several generations.

37.     While being held at the airport holding cell, we were allowed to go to an area where we could shower and shave, unfortunately it was at the top of a very long flight of steps. I have herniated disks and going up and down the stairs caused a major problem

with my back, it became extremely painful and I suffered several weeks before they took me to a doctor to get help. I was in great pain and could not stand up straight and I could hardly move. My back was in such shape that I had to use crutches in order to get around, I was struggling for some time, and unknown to me at the time, the officers were taking pictures of me struggling to get around.

38.     The Doctor gave me a shot of something that really helped. I was in much less pain and could walk around fairly well, and again unknown to me the agents were still taking pictures of me, but now I was walking okay. Still unknown to me at the time, the officers were still taking pictures of me but now I'm walking around with no problem and those pictures became an issue awhile later.

39.     It was discovered from the CLOSS FILES that Plaintiffs arrival was known by the Officials, long before he arrived, and that Plaintiff was not and is not, the only target of this government's agents.

40.     It was discovered from the CLOSS FILES that the Nigerian Governments agents along with agents of the Nigerian Drug Law Enforcement Agency, and government paid inmates of the prison known as John Does 1-10 were all colluding together.

41.     It was discovered from the CLOSS FILES that the Agents manipulated the Nigerian Court system, which guaranteed that Steward would not be deported home as Mrs. Emi was, **even after Anthony Chinedu Okeke signed a confession and admitted Steward had no idea what was going on and that Steward and Mrs. Emi, had no**

**knowledge of any drugs**. (Exhibit "D") There was a signed confession and he also admitted the same to my Attorney.

42.    It was discovered from the CLOSS FILES that the Nigerian Governments Agents were so afraid that Steward would be deported, they, with the aid of workers from the Central Bank of Nigeria, presented false documents to the court, with an attempt to further frame Steward, for supposedly funneling money through the Central Bank, however when the Prosecuting Counsel Mike T. Kassa Esq. seen the documents, his statement was "I know it when I see a setup", but yet still gave reference to a possibility the fake papers may have some reference and stated "Defendant Steward as far as we can find has no criminal record in Nigeria", The result, the Defendants manipulation of my case was purposely postponed until it was impossible to go in front of the same judge that his other victim had seen, so instead of being deported as the Prosecuting and my Defense Attorney agreed to, I was returned back to the holding cell in the airport.

43.    It was discovered from the CLOSS FILES that Anthony Chinedu Okeke was taking instruction from, an uncle who at the time was reported to be a senator, the Personnel at the prison, and from NDLEA agents.

44.    On October 23, 2018 Plaintiff and the person who was the cause of all this went to court again, he plead not guilty, and I plead not guilty under the instructions of the attorney I had, Mr. Kenneth Osomo and we were both immediately taken from the court to Kuje prison to wait for trial.

45.    October 31, 2018, the first of many threats to my life. (Exh. "E Page 1-6").

46.     When arriving at the prison, I was placed in the same cell group as Anthony and this was not by accident, their plan was to pay for everything I needed, just to make it look as if I was a part of everything they were doing, then on September 8, 2018, the inmates via a cell phone were in communication with the drug cartel, NDLEA agents and other officials in the prison, on what to do with me. They were all under the impression I was asleep, (I WAS NOT), I could clearly see and hear what was going on. The bunk I was in was setup as if I were on display in a coffin, they placed chairs around the room and had a conference call as to whether or not they were going to kill me. That next morning when they were collecting the inmates to go to court, I stepped out and refused to go back in, stating they were going to kill me.

47.     That afternoon when it was time to return to the cell I was told to stay in the clinic, I did, and the guards came and literally carried me back to the same cell. The next day I was moved to a different cell, not knowing how things worked. It turns out it did not matter what cell you would be put in; it is the same group of leaders in each cell.

48.     After all that I was allowed to go to the clinic each day and sit there, away from the general population, just to try and stay out of sight and in less danger.

49.     Physically I was at a point where I could not get around by myself, someone would have to be assigned to me to make sure I could get from one place to another, The American Embassy brought in a pair of churches to help me get around a little easier.

50.     In the new cell, the paid inmates would continually try to intimidate me. There was no running water, each cell dormitory has several 55-gallon drums that are

filled daily with water from one of the wells, you cannot drink it only cleaning and bathing in it, however by order of the cartel and other high-level defendants, they were ordered to set out what they call heavy water, in an attempt to get me to baith in it. My back was in bad shape and I could not get anything on my own, so I would have to pay others to get and do things for me. Heavy water is basically toilet water, with added bacteria supplied by the higher-level defendants. To bath you needed to scoop the water out of the drum into a bucket, I had to rely on someone to do this. This was a constant struggle, however, they did get me a few times with their heavy water, as a result I caught symptoms of Malaria, headaches, etc., and I'm still suffering effects from the things they had done to me.

51.     In the early morning on December 15, 2018, the first, 10 million Nara open kill order (Exhibit "E" page 2) was transmitted to all the inmates who had phones. I was able to see this when an inmate walked by me with the phone in his hand, I was able to get to the clinic, before anyone was able to try and collect. Just before it was time to return to the cell, it was decided among the higher-level Defendants, that it would be too risky to act on their Kill Contract it at that moment.

52.     On December 19, 2018, a 6 million Nara contract to kill was issued, (Exhibit "E" page 2) stating it was to be split between cell members, and a vote was taken in the cell to kill me, it was a very heated time, however it was stopped by others in the cell, it was discovered that the government agents, actually paid some of the inmates in advance, this was reported by me to the American Embassy, who would keep calling

asking questions, which made them think twice on proceeding.

53.     On December 23, 2018 a 5 million Nara contract to kill was issued to take place outside of the cell only, and on my way to the clinic I was struck in the back by someone, (Exhibit "E" page 2) they later came to the conclusion if something were to happen outside of the cell area, it would be difficult to say who did what.

54.     On December 31, 2018 another vote was taken in the cell to kill me, I lost the vote and stayed awake, (Exhibit "E" page 2), it was determined at the time it would cause to much trouble if I were to be murdered in the cell.

55.     January 11, 2019, another threat to life (Exhibit "E" page 2), the other attempts to kill me failed, mostly due to the efforts of the American Embassy, so the inmates were ordered to put various poisons in my food.

56.     My diet was very limited (Exhibit "E" page 5) because I'm allergic to tomatoes which is in about everything there. My diet consisted during the 16 months of torture consisted of the following: Ginger drink & Coffee, Eggs and Rice – Eggs and Bread – Eggs and Beans - non digestive cookies – fruit, water & mixed nuts, that was all I could eat without side effects. I was 185 lbs., when I arrived, I was 107 lbs., and very sick when I left, then the Covid hit, I became worse, I'm still not totally recovered.

57.     January 11, 2019, was the first attempt of poisoning (Exhibit "E" page 2). My food had a strange taste, I ate very little but I still had a stomach ache, headache & diarrhea.

58.    January 20, 2019, something put into my drinking water (Exhibit "E" page 2), the bottled water smelled like sewage, I didn't drink any of it, however one of the inmates tried to make it look like I was overreaching so he drank a big mouth full, and got sick.

59.    April 09, 2019 there was a major leak in what was being planned against me (Exhibit "E" page 3), one of the Doctors overheard what was going on and put a stop to it, but that was after I was given an egg that was totally black inside, I did not eat it either.

60.    April 11, 2019, one of the guards said they were going to start charging me for sitting in the clinic bed, he was serious, (Exhibit "E" page 3), I got up and went back to the cell. By the time I got back to the cell, the Doctor was their waiting for me and told me he was joking, and tried to encourage me to keep going to the clinic, because of the constant threats.

61.    By order of the higher up Defendants, the death threats, the poisoning attempts, and physical attacks continued (Exhibit "E" page 3 and 4), but by continually changing my movements I was able to avoided most everything by not keeping a set time schedule of my movements.

62.    November 5, 2019, the high-level Defendants were getting worried, because I had been writing down most everything that was going on. They even went as far as to go through the things I had in my bunk, trying to see what I was writing down. In case my notes were to disappear, I made several copies of everything, and actually gave

one of the Doctors and the Pastor my notes so they could make a copy, this was just to calm them down they were getting very nervous.

63.    Throughout the 16 months of torture, there were many violations put into effect by the Defendants including but not limited to violations of; The Alien Tort Claims Act (ATCA) and The Foreign Sovereign Immunities Act (FSIA), The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment, international law, The Nigerian Constitution, and several other laws and international agreements. See personal notes (Exhibit "E") incorporated into this complaint.

### COUNT I
### MURDER FOR HIRE

64.    Plaintiff re-alleges the allegations set forth in Paragraphs 1-63 above and incorporates same herein by reference.

65.    In violation of and not limited to 18 U.S.C. § 1958, International law, The Alien Tort Claims Act (ATCA), The Foreign Sovereign Immunities Act (FSIA), The Nigerian Constitution, The African Charter on Human and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, , and John Does 1-20, caused Plaintiff to travel from the United States of America to Nigeria, the Defendants enticed Plaintiff to travel to Nigeria and paid the cost of his air fare and lodging and food through interstate commerce, and in the prison paid and encouraged inmates to murder Plaintiff in clear violation of

state and international law. Thus, Defendants are liable to Plaintiff for compensatory and

punitive damages and any other damages the Court deems just and proper.

## COUNT II
### CONSPIRACY TO COMMIT MURDER

66.    Plaintiff re-alleges the allegations set forth in Paragraphs 1-65 above and

incorporates same herein by reference.

67.    In violation of and not limited to 18 US Code § 1117,

International law, The Alien Tort Claims Act (ATCA), The Foreign Sovereign

Immunities Act (FSIA), The Nigerian Constitution, The African Charter on Human

and Peoples' Rights, Defendants Federal Republic of Nigeria, Nigerian Drug Law

Enforcement Agency (NDLEA), Central Bank of Nigeria, , and John Does 1-20,

intentionally entered into an agreement to kill the Plaintiff and that agreement

resulted in several government paid inmates attempts to kill the Plaintiff. Thus,

Defendants are liable to Plaintiff for compensatory and punitive damages and any other

damages the Court deems just and proper.

## COUNT III
### ATTEMPTED MURDER

68.    Plaintiff re-alleges the allegations set forth in Paragraphs 1-67 above and

incorporates same herein by reference.

69.    In violation of and not limited to; 18 US Code § 1113,

international law, The Alien Tort Claims Act (ATCA), The Foreign Sovereign

Immunities Act (FSIA), The Nigerian Constitution, The African Charter on Human

and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law

Enforcement Agency (NDLEA), Central Bank of Nigeria, , and John Does 1-20, on or

about Dec. 10, 2018, at the Kuje Prison, in Abuja Nigeria, the defendants,

Central Bank of Nigeria, Federal Republic of Nigeria, Nigerian Drug Law Enforcement

Agency (NDLEA) and John Does 1-20, did with clear intent to kill, the Plaintiff

Albert Steward, a Citizen of the United States; in violation of Title 18, United

States Code, Sections 1113. Thus, Defendants are liable to Plaintiff for compensatory

and punitive damages and any other damages the Court deems just and proper.

**COUNT IV**
**CRULE AND INHUMAN TREATMENT**

70.     Plaintiff re-alleges the allegations set forth in Paragraphs 1-65 above and

incorporates same herein by reference.

71.     In violation of and not limited to; 18 U.S.C. §§ 2340–2340A,

International law, The Alien Tort Claims Act (ATCA), The Foreign Sovereign

Immunities Act (FSIA), the African Charter on Human and Peoples Rights, The Law of

Nations and The Nigerian Constitution, Defendants, Federal Republic of Nigeria,

Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, , and John

Does 1-20, intentionally inflicted mental and physical pain on the Plaintiff

Albert Steward, and issued instructions to its agents to continually torment

Plaintiff by keeping him in prison and having its agents torment him by

continually talking about killing him making sure he could hear the

conversations and having its agents put chemicals in his food and water, which has caused the Plaintiff to have respiratory and other problems. Thus, Defendants are liable to Plaintiff for compensatory and punitive damages and any other damages the Court deems just and proper.

**COUNT V**
**TORTURE**

72.     Plaintiff re-alleges the allegations set forth in Paragraphs 1-71 above and incorporates same herein by reference.

73.     In violation of and not limited to; violations of international law, The Alien Tort Claims Act (ATCA), The Foreign Sovereign Immunities Act (FSIA, The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the African Charter on Human and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, , and John Does 1-20, inflicted severe mental and physical pain and suffering by paying inmates to kill Plaintiff, Sending a kill order via text message to any and all inmates who had phones, phones purchased from the government officials, and instructing inmates to go to any area where Plaintiff was and to talk loud enough for Plaintiff to over here them talking and making plans on how they were going to kill him, or just have the Plaintiff disappear. It is clear that Defendants were operating with the consent and instructions of the Governments agents, to intimidate Plaintiff

and make him fearful of his life. Thus, Defendants are liable to Plaintiff for compensatory and punitive damages and any other damages the Court deems just and proper.

**COUNT VI**
**FALSE IMPRISONMENT**

74.   Plaintiff re-alleges the allegations set forth in Paragraphs 1-73 above and incorporates same herein by reference.

75.   In violation of and not limited to; The Alien Tort Claims Act (ATCA), The Foreign Sovereign Immunities Act (FSIA, the Nigerian Law of Torts (1999), the African Charter on Human and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, and John Does 1-20, intentionally held Plaintiff against his will, even after receiving a full confession from the other Defendant (**Anthony Chinedu Okeke**) that Plaintiff had no knowledge of any drugs, and was completely innocent. Despite having this confession, Defendants continued to hold Plaintiff, and eventually sent him to be tortured in Kuje prison for 15 months, causing physical suffering, mental suffering and humiliation, the loss of all his internet business, the loss of the sale of his business and worst of all Plaintiff did not commit any crimes, and the Defendants knew this all along. Wherein Anthony Chinedu Okeke, has admitted to framing Plaintiff and is currently serving his sentence at Kuje Prison. Thus, Defendants are liable to Plaintiff for

compensatory and punitive damages and any other damages the Court deems just and proper.

## COUNT VII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

76.     Plaintiff re-alleges the allegations set forth in Paragraphs 1-75 above and incorporates same herein by reference.

77.     In violation of and not limited to; The Alien Tort Claims Act (ATCA), The Foreign Sovereign Immunities Act (FSIA, the Nigerian Law of Torts (1999), the African Charter on Human and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, and John Does 1-20, all knew from Defendant (**Anthony Chinedu Okeke**) confession, Exhibit "D"), that Plaintiff had done nothing to justify his continued confinement. Their direct actions, causing Plaintiff to be sent to Kuje prison and paying inmates to kill and harass Plaintiff was completely and purposefully intentional, despite the fact Plaintiff was proven to be innocent. Thus, Defendants are liable to Plaintiff for compensatory and punitive damages and any other damages the Court deems just and proper.

## COUNT VIII
### DEFAMATION AND FRAUD

78.     Plaintiff re-alleges the allegations set forth in Paragraphs 1-77 above and incorporates same herein by reference.

79.     In violation of and not limited to; The Alien Tort Claims Act (ATCA), The Foreign Sovereign Immunities Act (FSIA, the Nigerian Law of Torts (1999), the African Charter on Human and Peoples' Rights, Defendants, Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, and John Does 1-20, presented to the court false documents that indicated Plaintiff had accounts at Central Bank of Nigeria, this was false. Then on March 25, 2019, Defendants forged Plaintiffs name and took N5,000 Nara from his order account (Exhibit "D" page 2). They used a fake signature to steel the money. Plaintiff questioned the removal and seen the fake signature in their record book. The money was never returned. Thus, Defendants are liable to Plaintiff for the missing N5,000 Nara plus compensatory and punitive damages and any other damages the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Albert R. Steward, III, respectfully asks this Court to enter judgment against Defendants awarding the following relief:

1. For an order of Judgment against Defendant for Plaintiffs' Murder for Hire claim (Count I) in the amount of $5,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

2. For an order of Judgment against Defendant for Plaintiffs' Conspiracy to Commit Murder claim (Count II) in the amount of $5,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys'

fees, and such other relief as the Court deems just and appropriate;

3. For an order of Judgment against Defendant for Plaintiffs' Attempted Murder claim (Count III) in the amount of $5,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

4. For an order of Judgment against Defendant for Plaintiffs, Cruel and Inhuman Treatment claim (Count IV) in the amount of $15,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

5. For an order of Judgment against Defendant for Plaintiffs' Torture claim (Count V) in the amount of $25,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

6. For an order of Judgment against Defendant for Plaintiffs False Imprisonment claim (Count VI) in the amount of $25,000,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

7. For an order of Judgment against Defendant for Plaintiffs Intentional Infliction of Emotional Distress claim (Count VII) in the amount of

Steward v Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency, Central Bank of Nigeria, and John Does 1-20.

Page 26 of 27

$615,648,972.00, the value of his lost business venture and software, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

8. For an order of Judgment against Defendant for Plaintiffs Defamation and Fraud claim (Count VIII) in the amount of $100,000.00, plus compensatory and punitive damage, interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and appropriate;

9. An award of pre-judgment interest, attorney fees, costs and post judgment interest in favor of Steward and against Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency (NDLEA), Central Bank of Nigeria, and John Does 1-20,

and

8. Such further and other legal and equitable relief as the Court may deem just and necessary under the circumstances.

**JURY DEMAND**

Plaintiff demands a jury trial on all claims for which a jury trial is available.

Dated: May 26, 2022

Respectfully Submitted:

By; Albert R. Steward III
345 Cedar St Apt 115
St. Paul, MN 55101
651-300-7755

Steward v Federal Republic of Nigeria, Nigerian Drug Law Enforcement Agency,
Central Bank of Nigeria, and John Does 1-20.

Page **27** of 27